UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FISK ELECTRIC COMPANY** | **CIVIL ACTION** |
| **VERSUS** | **No. 12-953** |
| **FIDELITY AND DEPOSIT COMPANY OF MARYLAND, ET AL.** | **SECTION I** |

### ORDER AND REASONS

Before the Court is a motion[1] for summary judgment filed by plaintiff, Fisk Electric Company. Defendants, Fidelity and Deposit Company of Maryland and Zurich American Insurance Company, have filed an opposition.[2] For the following reasons, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

### *BACKGROUND*

This Miller Act case arises from a construction project commissioned by the U.S. Army Corps of Engineers ("the Corps") for a pumping station in Jefferson Parish, Louisiana, known as the Planters Pump Station, USACE Project No. W912P8-09-D-0021-0002.[3] The Corps hired Benetech, L.L.C. ("Benetech") as the prime contractor on the project.[4] Benetech hired plaintiff, Fisk Electric Company ("Fisk"), to supply a 2865 KV diesel generator and related equipment for the pumping station.[5] Fisk filed this lawsuit alleging that Benetech failed to pay for the

---

[1] R. Doc. No. 22.

[2] R. Doc. No. 34.

[3] R. Doc. No. 1, at ¶ V; R. Doc. No. 22-2, at ¶ 1; R. Doc. No. 34-3.

[4] R. Doc. No. 22-2, at ¶ 1; R. Doc. No. 34-3.

[5] R. Doc. No. 22-2, at ¶ 3; R. Doc. No. 34-3.

1

generator, and that Benetech's Miller Act sureties have refused to pay for the full contract price of the generator.[6]

The negotiations for the purchase of the generator occurred late in the summer of 2010.[7] CDM Constructors Inc. ("CDM"), a major subcontractor on the project, initially obtained an estimate for the generator from Stewart & Stevenson Power Products LLC ("Stewart & Stevenson").[8] Stewart & Stevenson quoted CDM a price of $2,352,317.00 (not including tax) for the generator.[9] Because CDM had negotiated a lump sum payment for its services with Benetech, it would not have added, nor would it have been able to add, a profit margin to the approximate $2.3 million cost of the generator.[10]

Shortly after it had obtained the estimate from Stewart & Stevenson, CDM was "abruptly" terminated from the project, and Benetech contacted Fisk to supply the generator.[11] Benetech and Fisk memorialized the purchase of the generator in a purchase order agreement.[12] The purchase order agreement shows that Fisk agreed to supply the generator for $2,644,005.00.[13] However, Fisk later received change directives from Benetech that increased the purchase price to $2,710,792.00.[14]

---

[6] *See* R. Doc. No. 1.

[7] *See id.* at ¶ VII; R. Doc. No. 22-11, at p. 1; R. Doc. No. 22-8, at p. 1; R. Doc. No. 22-6.

[8] *See* R. Doc. No. 34-1, at ¶¶ 5-10.

[9] *See id.*; R. Doc. No. 22-11, at p.16.

[10] *See* R. Doc. No. 34-1, at ¶¶ 5, 9, 10.

[11] *See id.* at ¶ 8; R. Doc. No. 22-2, at ¶ 3.

[12] *See* R. Doc. No. 22-8.

[13] *See id.*; R. Doc. No. 22-2, at ¶ 4; R. Doc. No. 34-3.

[14] R. Doc. No. 22-2, ¶ 5; R. Doc. No. 34-3.

2

Norman "Pat" Clyne ("Clyne"), vice-president and general manager for Fisk's New Orleans division, testified in his deposition that the approximate $2.7 million charged to Benetech represented the cost of the generator plus engineering costs, interest, overhead, profit, and shared savings.[15] Clyne testified that the shared savings aspect of the deal was an incentive for Fisk to purchase the generator on the open market for less than the approximate $2.3 million that had been previously quoted by Stewart & Stevenson.[16] Clyne attests that he succeeded in this endeavor by purchasing the generator from EMDI-Hunt LLC ("Hunt") for $2,090,800.00.[17] Clyne described the negotiations regarding the shared savings as follows:

> Clyne: When Benetech came to us, they wanted us to purchase the Stewart & Stevenson equipment.
>
> Question: Let me make sure I understand that. Is that saying that Stewart & Stevenson would have been a middleman between Fisk and EMDI? Is that how it worked?
>
> Clyne: No.
>
> Question: How would that work?
>
> Clyne: EMDI is a company just like Stewart & Stevenson is a company. And Stewart & Stevenson had given Benetech a quote for the generator, and Benetech came to me and said, "What is it going to cost me to order this equipment?" . . . .
>
> They came to me and wanted me to purchase the bill of material that I gave you prior to us starting the deposition, and we sat down and worked up the numbers and came up with a number that I would agree to to [sic] purchase the equipment. But I told them I said, "Hey, you know, if we can go out and get a better deal for you, can we use somebody else other than Stewart & Stevenson and I will give you the exact equipment?"

---

[15] R. Doc. No. 22-6, at pp. 62-63.

[16] *See id.*

[17] *See id.* at pp. 31-33, 62.

And they said, "Can you do that?" And I said, "I don't know, but I will try." So we went out and contacted different people and came back and said, "We can give you the exact same thing as the Stewart & Stevenson building material for this number." And they said, "That sounds good with us."

\* \* \*

Question: You mentioned earlier that part of the initial negotiations with Benetech with respect to the Stewart & Stevenson generator and not using that one was that you wanted to work out a better deal. Did Benetech pay less money for the Hunt generator than they would have paid for the Stewart & Stevenson generator?

Clyne: Yes. Over $200,000.

Question: To make sure I understand it, is that saying that the Stewart & Stevenson generator would have cost instead of, say, $2.7 million rounded, it would have cost close to $2.9 million rounded?

Clyne: Pretty close to 2.9 million.

Question: In terms of that $200,000 savings, was that money that was taken out Fisk profits, or because of use of different equipment? How was that $200,000 savings realized in this deal?

Clyne: How was it written?

Question: In other words, where did it come from? Like if you walk into a store and they say something is 10 percent off, that's the store saying we're cutting 10 percent off the top automatically. Was that Fisk saying we are just going to cut some money out of our own profit, or was it something else going on there?

Clyne: It was potential negotiations with Hunt, and Frank wanted to get the deal done. So we put a number out there, and Benetech agreed to it and took the savings.

Question: Did the savings come from Hunt having a lower price than Stewart & Stevenson or from Fisk offering a lower price than Fisk would have offered otherwise had it been Stewart & Stevenson?

4

>           Clyne: No. It was the fact that we were able to go to Hunt. We
>           went – we offered Stewart & Stevenson the job, and they wouldn't
>           take it.[18]

There is no dispute that the generator was, in fact, purchased by Fisk, delivered to the project, and that it is currently "up and running."[19] Clyne attests that Fisk invoiced Benetech under the purchase order, but Benetech failed to pay anything for the generator.[20] When Benetech allegedly failed to pay for the generator, Fisk claims that it made amicable demand under the Miller Act against Fidelity and Deposit Company of Maryland and Zurich American Insurance Company (collectively, "the sureties"), which had issued a Miller Act payment bond in favor of Benetech in connection with the project.[21] Although Fisk was able to recover $2,000,000.00 on the payment bond, the sureties refused to pay the remaining $710,922.00 due under the purchase order agreement.[22] Attempting to collect the remaining balance it claims it is owed under the purchase order agreement, Fisk filed this lawsuit against the sureties under the Miller Act.[23]

Fisk contends that it has satisfied its obligations under the purchase order by supplying the generator to the project.[24] Because it claims that Benetech failed to pay after more than 90 days, Fisk contends that it is entitled recover on the payment bond in the full amount of the

---

[18] Clyne dep. at pp. 20-22, 55-56.

[19] R. Doc. No. 22-2, ¶ 6; R. Doc. No. 34-3.

[20] R. Doc. No. 22-7, at ¶ 11.

[21] R. Doc. No. 1, at ¶¶ XII, XIV; R. Doc. No. 8, at ¶ 12; R. Doc. No. 22-2, at ¶ 2; R. Doc. No. 34-3.

[22] *See* R. Doc. No. 8, at ¶ 17.

[23] *See* R. Doc. No. 1.

[24] *See* R. Doc. No. 22-1.

agreed upon contract price, including profits and shared savings.[25] Fisk contends that there are no genuine issues of material fact that prevent it from recovering the $710,922.00 balance remaining under the purchase order agreement, costs, interest, and attorney's fees.[26]

The sureties agree that they have already paid $2,000,000.00 to Fisk under the Miller Act payment bond.[27] They contend, however, that they "balked" at paying the remaining $710,922.00 owed under the purchase agreement which they argue raises "questions about the cost of the generator."[28] The sureties essentially argue that they believe Fisk and Benetech may have colluded to negotiate an artificially inflated price for the generator with the expectation that the cost would be borne by the sureties rather than Benetech.[29] The sureties rely heavily on the fact that CDM had obtained a quote to supply the generator to Benetech for approximately $2.3 million, which is roughly $400,000 less than the approximately $2.7 million Fisk charged under the purchase order agreement.[30] The sureties also argue that collusion may be inferred by the "fuzzy math" and circumstances surrounding the transaction as well as the claimed lack of evidence that Fisk ever attempted to collect the purchase price from Benetech.[31] Finally, the sureties argue that they were prejudiced by the fact that Fisk failed to reasonably give them notice when it discovered that Benetech would never pay.[32]

---

[25] *See id.*

[26] *See id.*

[27] *See* R. Doc. No. 8, at ¶ 17.

[28] R. Doc. No. 34, at p.6.

[29] *See id.* at pp. 7-12.

[30] *See id.*

[31] *See id.*

[32] *See id.*

## *STANDARD OF LAW*

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotation and citation omitted) (alteration in original).

*DISCUSSION*

**I.  Miller Act Claims**

"The Miller Act requires general contractors on most federal construction projects to furnish a bond for performance and to secure payment to all suppliers of labor and materials." *J.D. Fields & Co. v. Gottfried Corp.*, 272 F.3d 692, 696 (5th Cir. 2001). The Miller Act provides:

> Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government [performance and payment] bonds, which become binding when the contract is awarded.

40 U.S.C. § 3131(b).[33] The Miller Act authorizes an action on the payment bond when the prime contractor fails to pay for labor or materials within 90 days. *See* 40 U.S.C. § 3133(b)(1). The Miller Act provides:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

40 U.S.C. § 3133(b)(1). "This statutory scheme was created to protect parties such as subcontractors or suppliers who work on federal projects as state-law liens cannot be applied

---

[33] "The performance bond secures the performance of the contract for the benefit of the government, while the payment bond protects persons supplying labor and material in the prosecution of the contract work." *Asbestos Abatement Contractors, Inc. v. Home Guard Envtl. Restoration Servs., Inc.*, No. 11-3118, 2012 WL 1664549, at *3 (E.D. La. May 11, 2012) (Vance, J.) (quoting Government Contracts: Law, Administration, Procedure (Walter Wilson, Gen. Ed.), Ch. 49A, § 49A.20 (Matthew Bender)).

8

against federally-owned property and traditional state-law remedies are unavailable."[34] *See Arena v. Graybar Elec. Co.*, 669 F.3d 214, 220 (5th Cir. 2012) (citing *U.S. for Use of Gen. Elec. Supply Co. v. U.S. Fid. & Guar. Co.*, 11 F.3d 577, 580 (6th Cir. 1993)). "[T]he Miller Act is highly remedial in nature and is entitled to a liberal construction and application in order to effectuate the Congressional intent to protect those who furnish labor or materials for public works." *J.D. Fields & Co.*, 272 F.3d at 698 (citing *Glassell–Taylor Co. v. Magnolia Petroleum Co.*, 153 F.2d 527, 529-30 (5th Cir. 1946)).

In this case, the parties do not dispute the fact that the sureties issued a payment bond in favor of Benetech for the construction project at issue; that Benetech contacted Fisk to supply the project with a 2865 KV diesel generator for the project; that Fisk and Benetech initially executed a purchase order agreement for the generator in the amount of $2,644,006.00; that Fisk subsequently received change directives from Benetech that increased the purchase order to $2,710,792.00; or that Fisk actually purchased the generator and supplied it in accordance with the purchase order agreement.[35] The sureties also agree that they have already paid $2,000,000.00 to Fisk on the payment bond.[36] Although the sureties argue, in part, that the remaining balance is not recoverable under the Miller Act because it is attributable to "savings" rather than "labor or material," the Fifth Circuit has long held that "the amount properly recoverable under the Miller Act by a subcontractor is the agreed contract amount without regard to whether the amount may or may not include profits." *Price v. H. L. Coble Const. Co.*, 317

---

[34] "A mechanic's lien under state law against improved property provides security for suppliers of labor and material to private construction projects, but a mechanic's lien cannot attach to government property." *U.S. for Use and Benefit of T.M.S. Mechanical Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Texas*, 942 F.2d 946, 949 (5th Cir. 1991) (citing *F.D. Rich Co. v. U.S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 122, 94 S. Ct. 2157, 2161, 40 L. Ed 2d 703 (1974)).

[35] R. Doc. No. 22-2, at ¶¶ 1-6; R. Doc. No. 34-3.

[36] R. Doc. No. 8, at ¶ 17.

F.2d 312, 318 (5th Cir. 1963) (citing *U.S. for Use of Soda v. Montgomery*, 253 F.2d 509, 511 (3d Cir. 1958)). Accordingly, absent a legally recognized defense, Fisk is entitled to recover the agreed contract amount of $2,710.922.00, even if it includes profits and even if those profits are in the form of "savings." *See Taylor Constr. Inc. v. ABT Serv. Corp.*, 163 F.3d 1119, 1122-23 (9th Cir. 1998) (holding that shared savings are recoverable under the Miller Act as part of the agreed contract amount).

The sureties contend that summary judgment is inappropriate because genuine issues of material fact remain with respect to "questions about the cost of the generator."[37] Although the Court acknowledges that "a surety's obligation under a Miller Act bond may be absolved . . . in cases involving unfair dealing or fraud on the part of the subcontractor," *see U.S. ex. rel. IBM Corp. v. Hartford Fire Ins. Co.*, 112 F. Supp. 2d 1023, 1031 (D. Haw. 2000) (citing *U.S. Fidelity & Guaranty Co. v. United States*, 191 U.S. 416, 426, 24 S. Ct. 142, 48 L. Ed. 242 (1903)); *see also Price v. H.L. Coble Constr. Co.*, 317 F.2d 312, 319 n.7 (5th Cir. 1963), the sureties have not demonstrated that their obligations under the Miller Act have been absolved in this case.

As a preliminary matter, the sureties waived such defenses by failing to affirmatively raise them in their pleadings. The pleading of affirmative defenses is governed by Rule 8(c) of the Federal Rules of Civil Procedure. "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:

> • accord and satisfaction;
> • arbitration and award;
> • assumption of risk;
> • contributory negligence;
> • duress;
> • estoppel;
> • failure of consideration;
> • fraud;

---

[37] *See* R. Doc. No. 34.

- illegality;
- injury by fellow servant;
- laches;
- license;
- payment;
- release;
- res judicata;
- statute of frauds;
- statute of limitations; and
- waiver.

Fed. R. Civ. P. 8(c). To the extent that the sureties' opposition to the motion for summary judgment is based on allegations of fraud, such a defense must be plead with "particularity." *See* Fed. R. Civ. P. 9(b); *see* Steven Baicker-McKee, et. al., Federal Civil Rules Handbook 374 (2012) ("When asserting fraud or mistake in counterclaims or affirmative defenses, the pleader must assert fraud or mistake there with particularity."); *see also Siemens Med. Solutions USA, Inc. v. Sunrise Med. Tech. Inc.*, No. 04-2711, 2005 WL 615747, at *4 (N.D. Tex. Mar. 16, 2005) (Sanders, J.) ("Defendant's affirmative defense of fraud is analyzed under the particularity requirement of Rule 9(b)."); *Cosmetic Warriors Ltd. v. Lush Boutique, L.L.C.*, No. 09-6381, 2010 WL 481229, at *1 (E.D. La. Feb. 1, 2010). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Global Healing Ctr., LP v. Powell*, No. 10-4790, 2012 WL 1709144, at *2 (S.D. Tex. May 15, 2012) (quoting *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)). "Put simply, Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

The sureties raised seven affirmative defenses in their answer. Only the fifth affirmative defense could possibly encompass the defenses they have attempted to raise in their opposition to

11

the motion for summary judgment. Defendants' fifth affirmative defense states, "Fisk's damages, if any, were caused by the negligence, wrongful conduct, or fault of others and such conduct on the part of others caused or contributed to the loss or damage complained of by Fisk, if any."[38] This allegation falls far short of the level of particularity required to plead the defense of fraud and collusion they rely upon in their opposition to the motion for summary judgment. *See Frith v. Guardian Life Ins. Co.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998) (explaining that Rule 9(b) applies "to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud."). Nor does it give notice of the remaining defense relating to Fisk's alleged failure to act "as a reasonable man" when it allegedly failed to provide timely notice of Benetech's failure to pay. *See Schlosser v. Metro. Prop. and Cas. Ins. Co.*, No. 12-1301, 2012 WL 3879529, at *2 (E.D. La. Sept. 6, 2012) (explaining that, at the least, "a defendant is required to plead an affirmative defense 'with enough specificity or factual particularity to give the plaintiff "fair notice" of the defense that is being advanced.'") (quoting *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999)).[39]

More importantly, however, even if such defenses were viable, the sureties have failed to come forward with sufficient evidence to defeat summary judgment. The sureties rely primarily on the affidavit of Peter T. Bailey ("Bailey"), senior vice-president of CDM, who states that CDM would have supplied the generator for, at most, $2.3 million in accordance with the Stewart & Stevenson estimate.[40] Bailey also attests that, in his opinion, "the amount negotiated

---

[38] R. Doc. No. 8. Except as relates to the sureties' claim that Fisk failed to reasonably give notice of Benetech's failure to pay, the sureties offer neither argument nor evidence in support of the assertion in their fifth affirmative defense that Fisk's damages are the result of any negligent conduct.

[39] The Court also notes that plaintiff raised its argument regarding waiver of defenses in its reply memorandum and the sureties neither responded nor sought leave to amend their answer to include the defenses raised in its opposition to the motion for summary judgment.

[40] R. Doc. No. 34-1, at ¶10.

12

by Benetech and Fisk for the generator required a gross overpayment of at least $400,000 for the generator."[41]

Although Fisk ultimately supplied the generator for approximately $2.7 million, the sureties' reliance on the Stewart & Stevenson estimate overlooks the fact that CDM's profits were built into its lump-sum contract with Benetech. Bailey specifically stated that "[s]ince CDM was receiving lump sum payment for all of its work on this project, CDM would not have added, nor would it have been able to add, a profit margin to the cost of the generator."[42] In contrast, Fisk's profit (including the shared savings) was built into the purchase price of the generator and negotiated as part of the purchase order agreement. The mere fact that the negotiated price included an incentive in the form of shared savings is not, in and of itself, suggestive of anything improper. *See, e.g.*, *Taylor Constr. Inc. v. ABT Serv. Corp.*, 163 F.3d 1119, 1122-23 (9th Cir. 1998). The sureties have come forward with no evidence beyond their own speculation which would demonstrate that the terms of this negotiated transaction raise any genuine issues of material fact with respect to fraud, collusion, or unfair dealing.

The sureties have also failed to show that Fisk violated a duty to seek payment from Benetech or to promptly notify the sureties of non-payment. The sureties contend that "[b]y not attempting to obtain payment from Benetech, Fisk allowed enough time to lapse for the money

---

[41] *Id.* at ¶ 12. Regardless of whether Bailey's opinion is treated as permissible opinion testimony by a lay witness under Federal Rule of Evidence 701 or impermissible expert testimony under Federal Rule of 702, the Court agrees with Fisk that Bailey's opinion is not helpful to the sureties. Like the position taken by the sureties in this case, Bailey's opinion fails to take into account the fact that CDM was able to supply the generator at cost since its profits were built into the lump-sum payment it had negotiated with Benetech. *See* R. Doc. No. 34-1, at ¶¶ 10-12. In contrast, Fisk's profit (including the shared savings) was built into the purchase price of the generator and negotiated as part of the purchase order agreement. *See* R. Doc. No. 22-6, at pp. 62-63. Bailey's "opinion" fails to raise any genuine issues of material fact regarding fraud or collusion because it compares apples to oranges.

[42] R. Doc. No. 34-1, at ¶ 9.

received by Benetech from the Corps for the generator to be gone."[43]  The sureties argue that "[c]ase law indicates that a duty on the part of Fisk to notify the sureties of non-payment can be implied if 'a reasonable man in [Fisk's] position would have realized that [Benetech] would not ever make payment." (R. Doc. No. 34, at p. 8) (quoting *U.S. ex. rel. IBM Corp. v. Hartford Fire Ins. Co.*, 112 F. Supp. 2d 1023, 1031 (D. Haw. 2000); *Am. Auto Ins. Co. v. U.S. for the use and benefit of Luce*, 269 F.2d 406, 411 (1st Cir. 1959)).

However, the sureties have come forward with no evidence to contradict Clyne's testimony that Fisk did, in fact, attempt to get paid by Benetech by sending each of the invoices attached to the motion for summary judgment to Benetech for payment.[44] The sureties have also failed to come forward with evidence that Fisk knew or should have known that Benetech would never make payment before Fisk made demand for payment on the bond.  *See, e.g.*, *IBM Corp.*, 112 F. Supp. 2d at 1034.  Finally, Fisk notified the sureties of the non-payment and promptly made amicable demand for payment after the requisite 90 days under the Miller Act had passed.[45]  As the court noted in *IBM Corp.*, to require more under these circumstances "would discourage settlements and negotiations with the original parties to a contract and could potentially cause unnecessary litigation between the sureties, contractors and subcontractors." *See id.*

In summary, Fisk has established that it is entitled to recover the $710,922.00 balance remaining under the purchase order agreement.  The sureties waived the defenses they now seek

---

[43] R. Doc. No. 34, at p. 7.

[44] *See* R. Doc. No. 22-7, at ¶ 11.

[45] The parties do not genuinely dispute the fact that the purchase order was fulfilled by the end of the week of May 30, 2011.  *See* R. Doc. No. 34, at p. 4 & n.4; R. Doc. No. 43, at pp. 6-7.  Fisk made amicable demand on the sureties on September 8, 2011.  R. Doc. No. 34-2, p. 12.

to raise when they failed to properly plead them as affirmative defenses in their pleadings. Even if not waived, the sureties have failed to come forward with evidence absolving them of their obligations under the Miller Act. As the Fifth Circuit has recognized, summary judgment cannot be defeated by "metaphysical doubt as to the material facts, . . . conclusory allegations, . . . unsubstantiated assertions, or . . . only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Accordingly, Fisk is entitled to summary judgment in the full amount of the $710,922.00 balance remaining under the purchase order agreement.

## II. Attorney's Fees

Fisk also contends that it is entitled to summary judgment with respect to its claim for attorney's fees. However, Fisk failed to identify any evidence in its motion for summary judgment, whether documentary or testimonial, supporting its claim for attorney's fees.[46] Accordingly, Fisk has not demonstrated that it is entitled to summary judgment on its claim for attorney's fees.

### CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED IN PART** and that plaintiff is entitled to summary judgment on its claim for $710,922.00 against the sureties, plus costs and interest allowed by law.

**IT IS FURTHER ORDERED** that Fisk's motion *in limine* to exclude the opinion testimony of Peter Bailey is **DISMISSED AS MOOT**.

---

[46] During the pretrial conference, counsel for plaintiff advised the Court that they assumed, incorrectly, that the request for attorney's fees would be determined separately. *See also* R. Doc. No. 22-1, at p. 10. Counsel for defendants objected to the presentation of evidence at trial relating attorney's fees. The Court notes that it did not have the benefit of the pretrial order when it previously ordered additional briefing with respect to plaintiff's legal right to attorney's fees.

**IT IS FURTHER ORDERED** that Fisk's motion for summary judgment is **DENIED** with respect to attorney's fees.

New Orleans, Louisiana, February 14, 2013.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**